EXCELSIOR MINING COMPANY *v.* WILLSON.

4-7290          178 S. W. 2d 252

Opinion delivered March 6, 1944.

*Shouse & Shouse,* for appellant.

*Henley & Henley,* for appellee.

Holt, J. On January 21, 1943, the parties to this action entered into a contract, evidenced by the following letter: "Harrison, Arkansas, January 21, 1943, Mr. J. O. Willson, St. Joe, Arkansas. Dear Mr. Wilson: This letter is to provide a written understanding regarding, the sale and removal of chats now produced and in stock pile at our Excelsior mine near St. Joe, Arkansas. It is understood that you are to purchase these chats in the stock pile at the rate of (35) cents per ton, and that any expense of loading in trucks or other hauling methods, haulage to rail siding or destination is to be borne by you. It is estimated that the present stock pile of this date will approximate not more than 1,200 tons, and in order to clarify the total amount to be sold to you at this price of (35) cents per ton we will herewith state that not more than 1,200 tons will be sold to you at this rate.

"As to basis of payment it is further understood that the chats which you in turn sell to the Arkansas Highway Dept. or any other source shall be paid for by the purchaser to the Excelsior Mining Company in care of the Security Bank at their place of business in Harrison, Arkansas, and they shall deduct the amount of (35) cents per ton for all tons purchased and turn over to the Excelsior Mining Company such sums of money as determined by multiplying the total tons sold by the price per ton of 35 cents. The balance left after this deduction shall be turned over to you. Your acknowl-. edgment of the above shall be deemed admitted by signing in the place so provided on the enclosed duplicate. Yours very truly, Excelsior Mining Company, by Doyle A. Palmer, Exc. Vice Pres. Jno. O. Willson."

On June 14, 1943, appellee, Willson, sued appellant alleging in his complaint, among other things, "that shortly after the first week in June of 1943 he learned that Excelsior Mining Company was preparing to dispose of all of the chats produced at said Excelsior mine, including the chats purchased and contracted for by this plaintiff, by selling said chats to the Arkansas Highway Department . . .; that although plaintiff had contracted for the chats, and despite the fact that his nego-

tiations made possible said sale of said chats to the state, defendant is now preparing to move said chats momentarily without recognizing the contract of this plaintiff, without compensation to this plaintiff, without notice to this plaintiff, against his will and in violation of the terms of the contract heretofore annexed hereto; that defendant may at this time be moving said chats in violation of plaintiff's contract." He further alleged that as a result of appellant's breach of said contract, he had suffered damages and "loss of profit on said chats to the extent of $1 per ton on 1,200 tons, or $1,200."

His prayer was for injunctive relief to prevent appellant from removing said chats, "except in specific performance of plaintiff's contract, and that on final hearing said injunction be made permanent, for his damages in the sum of $................ for loss of time and expense money in negotiating said contracts together with his damages of $1 per ton for loss of profit on the sale of 1,200 tons, or $1,200 dollars, . . . Or plaintiff prays in the alternative that defendant, if defendant chooses, be permitted to continue delivery of said chats to agents of the highway department under orders of this court impounding the proceeds of said sale to said highway department in the hands of the clerk of this court pending final determination of this cause."

Appellant's answer admitted the execution of the contract, but denied every material allegation in appellee's complaint. Upon a trial there was a finding in favor of appellee, in the amount of $150, and a decree in accordance therewith. This appeal followed.

It will be observed from reading the contract in question that there is no provision as to the time for performance. The rule is well established that where there is no provision as to the time of the performance of the contract, the law implies that it must be performed within a reasonable time. What would be a reasonable time depends upon the intention of the parties at the time the contract was made, the facts and circumstances surrounding its making, or, in general, what was contemplated by the parties at the time.

In *Dunn* v. *Forrester*, 181 Ark. 696, 27 S. W. 2d 1005, this court in considering a contract for the sale of standing timber, in which no time was fixed within which the timber should be removed, said: "It is well settled in this state that, in a sale of standing timber, when there is no time fixed in the contract within which the purchaser is to remove the timber, the purchaser shall have a reasonable time, considering all the facts and circumstances surrounding the transaction, within which to remove the timber. (Citing many cases). This is in application of the fundamental principle that where a time is not specified for the performance of a contract, it should be performed within a reasonable time." See, also, 12 Amer. Jur., p. 854, § 299.

The instant case comes here for trial *de novo*. The primary question presented, and which we think is decisive, is: "Did appellee breach the contract by failure to perform within a reasonable time"? We think the great preponderance of the testimony supports appellant's contention that appellee did not perform the contract within a reasonable time, and the court erred in holding otherwise.

The material facts seem not to be in dispute. Appellee, Willson, testified that immediately after the execution of the contract, he enlisted the services of L. A. Watkins, who was interested in appellant's mine, to assist him in the sale of the chats to the highway department. Watkins negotiated with him "something like 90 days," and the final result of his negotiation with Watkins was a letter to appellee from Mr. Watkins. Just what this letter contained the record does not disclose. However, appellee makes no contention that Watkins continued to assist him longer than the 90 days. Appellee tried, without success, to sell the chats at $1.75 per ton to the State Highway Department.

On cross-examination, appellee testified: "Q. Mr. Willson, I understand that there is no dispute about the contract? A. No, sir, there wasn't any dispute. Q. You bought all the chats that were in the stock pile of chats in the mine. You have not accepted a single ton, have

you? A. No, sir. Q. You have not removed a single ton? A. I have not, but they have been removed. Q. Have you had any moved? A. Not I. Q. When the mill operates chats accumulate rapidly? A. Sometimes. Q. Unless you had been successful in selling these chats to the Arkansas Highway Department, to whom would you have sold them? A. No one. Q. Then unless you had been successful in selling to the Arkansas Highway Department, what would have become of the chats? A. That's a question I couldn't answer. Q. Would you have paid the mining company for them? A. No, they would have lost the chats, and in addition they would have had to remove them. Q. Then you would not pay anything for them? A. No. Q. Then it was all to gain and nothing to lose for you? A. Certainly it was. Q. Now, you negotiated for nearly five months and didn't pay for any of these chats. How much longer do you feel like they should wait? A. I didn't give that any thought. . . . Q. Isn't it true that before they (State Highway Department) would buy these chats you would have to go to considerable expense in arranging machinery to reprocess those chats? A. Yes, that is right.''

R. E. Winfrey, district engineer for the highway department, testified that the highway department had agreed to buy 650 tons of chats from appellant, Excelsior Mining Company, to be delivered by June 20, and that some of these chats were delivered "yesterday." He further testified: "Q. Mr. Winfrey, I understand that these chats had fine particles and foreign matters in them? A. I guess that's right. We require the chats to be clean before we buy them. Q. Then as I understand it, that requires some screen, some machinery? A. It requires screening. Q. Did you have anything to do with the negotiation between Mr. Willson and the highway department? A. No, sir. Q. What time of the year do you use chats? A. Twelve months in the year. However, we use it mostly during the warm months.''

Doyle A. Palmer, president and manager of appellant, Excelsior Mining Company, testified: "Q. That letter of contract binds you to sell the plaintiff the chats

that was in stock at the mine not to exceed 1,200 tons? A. That's right. . . . Q. You say the plaintiff gave you assurance that he could begin removing the chats within two weeks? A. Yes, sir." He further testified that appellee had not removed any of the chats, and that they were getting in the way; that they had waited for appellee to accept and remove the chats. "Q. What has he told you? A. Well, he said several times that he would soon be able to start removing the chats. The last time was several weeks ago. Q. You have said that you learned from him that he was not going to be able to sell the chats for highway purposes unless they were screened or reprocessed. A. Yes. Q. Did he give you any assurance that he was about to reprocess those chats? A. No. Q. When did you finally conclude that he wasn't going to try to sell them? A. A few weeks ago." He further testified that he contacted Mr. Winfrey of the highway department who examined the chats and informed Palmer that they would have to be screened before the highway department would accept them; that in order to meet the requirements of screening or reprocessing demanded by the highway department, appellant spent approximately $700 for machinery for this purpose, and that it would cost 75 to 80 cents a ton to reprocess them, and that the highway department agreed to accept 650 tons on the above conditions. They produce about 180 tons of chats a week, or approximately 450 tons per month.

There is other evidence that the chats accumulate rapidly.

In brief, appellee spent approximately five months trying to sell and dispose of the chats, but was unsuccessful. He tried to sell to the highway department only. In fact, he made no effort to sell to any one else and admitted that, unless he could sell to the highway department, he would sell to "no one." He admitted that before the highway department would accept the chats it was necessary that they be screened or reprocessed. He did not deny that this would require machinery and would cost 75 to 80 cents per ton. Appellant invested

approximately $700 in this reprocessing machinery. The chats accumulated rapidly, to the extent of about 450 tons per month and got in the way. The highway department used these chats the year round, but a larger percentage was used during the summer months.

It is our view that a great preponderance of the testimony shows that appellee failed to perform the contract within a reasonable time, and that he is not entitled to recover.

Appellee contends that appellant's abstract in this case does not comply with Rule IX of this court, and that the cause should be affirmed for this reason. While it does appear that some slight discrepancies appear in appellant's abstract, when compared with the record, we think on the whole that it is a substantial and sufficient compliance with our rule in this regard.

For the error indicated, the decree is reversed, and the cause dismissed.